IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **KIMBERLY R. PASCHAL,** | ) |
| **Claimant,** | ) |
| | ) Civil Action No. |
| v. | ) 2:09-cv-1609-KOB |
| | ) |
| **MICHAEL J. ASTRUE** | ) |
| **COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

    The Claimant, Kimberly R. Paschal, brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), and Section 1631(c) of the Social Security Act, 42 U.S.C. § 1383(c), seeking review of the Commissioner of Social Security's decision that the Claimant's period of disability ceased on August 1, 2004. Although she had previously received Social Security benefits as a child, the Commissioner found that the Claimant had not been disabled since August 1, 2004 and thus was ineligible for supplemental security income. (R. 30). The Commissioner upheld this decision on reconsideration. The Claimant filed a timely request for a hearing before an Administrative Law Judge; the ALJ held two hearings, the first on December 10, 2007 and a supplemental hearing on May 6, 2008. In a decision dated August 19, 2008, the ALJ determined that the Claimant was not disabled. On June 12, 2009, the Appeals Council denied the Claimant's request for review; consequently, the ALJ's decision became the

1

final decision of the Commissioner of the Social Security Administration. (R. 5). The Claimant has exhausted her administrative remedies, and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

In this appeal, the Claimant argues that the ALJ based his findings on "selective and non-contemporaneous evidence." The issue presented for review is whether the ALJ erred by failing to evaluate Dr. John Neville's consultative exam of the Claimant in determining her residual functional capacity (RFC).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standard and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Id.* at 999. However, this court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirely to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. I?
> (4)  Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520 and 416.920.

The Claimant bears the burden at the second step of the sequential evaluation of proving that she has a severe impairment or combination of impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). "An impairment or combination of impairments is not severe if it does not

significantly limit [the Claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a), [20 C.F.R.§ 404.921 (a)], *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *McDaniel*, 800 F.2d at 1031 (11th Cir. 1986); *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).

The ALJ must state with particularity the weight given different medical opinions and the reasons therefor, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must give the testimony of a treating physician substantial or considerable weight unless he shows "good cause" to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists where the opinion of the treating physician is accompanied by no objective medical evidence, is wholly conclusory, or is contradicted by the physician's own treatment records. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

## V. FACTS

Because the Claimant was a minor at the time her disability commenced, Claimant's mother applied for SSI on the Claimant's behalf on April 18, 2000, alleging disability commencing on December 1, 1997 because of "emotional and mental problems." (R. 83). The Social Security Administration (SSA) initially determined that the Claimant was disabled as a child as of April 1, 2000. (R. 34). The Claimant's primary diagnosis was anti-social personality disorder; her secondary diagnosis was diabetes mellitus. (R. 33). Upon attaining age eighteen, the

SSA requested that the Claimant undergo physical and mental consultative exams to determine whether she was still disabled as an adult. The Claimant underwent two exams.

The Claimant was twenty-three years old at the time of the administrative hearing decision. (R. 31). The Claimant has a limited education; she left high school after being expelled in tenth grade for bringing a weapon to school. She says that she completed a year of cosmetology school before being placed on probation but plans to continue her education. (R. 396-397).  Although the Claimant has some work history, the ALJ found that it did not rise to the level of substantial gainful activity and is not relevant past work. (R. 8-9).

The Claimant's medical records indicate that she has a history of inpatient and outpatient mental health treatment. She has been depressed and suicidal in the past. (R. 286). Dr. John Neville's psychological evaluation of the Claimant indicates that she has been raped, though it is unclear when the rape occurred. The Claimant is widowed; her husband died after the Claimant stabbed him during an argument. (R. 286, 397). She does not have a criminal record; the authorities ruled her husband's death an act of self-defense. (R. 286). She has one daughter. (R. 381).

On July 26, 2004, Dr. John Lisiak, D.O., an internist, performed a comprehensive consultative physical examination on the Claimant. (R. 277). He noted that the Claimant took insulin twice a day for her diabetes and used an Albuterol meter dose inhaler to treat her asthma. (R. 278). Dr. Lisiak diagnosed the Claimant with Type I diabetes (insulin-dependent), mild intermittent asthma, and severe tobacco use (nearly two packs of cigarettes a day). He also noted the Claimant's significant psychiatric and psychosocial history. (R. 281). Based on his physical examination and review of the Claimant's medical records, Dr. Lisiak concluded that the

Claimant had no expected limitation in her ability to perform the following activities: tasks of manual dexterity utilizing both hands on a frequent basis; tasks requiring her to bend at the waist, crouch, or stoop; tasks requiring her to lift or carry weights of ten to twenty-five pounds on a frequent basis and perhaps fifty pounds on an occasional basis; or tasks requiring her to sit, stand, or ambulate for periods of time of at least four hours or greater in an eight hour period. (R. 282).

The following day, July 27, 2004, Dr. John Neville, Ph.D., performed a consultative psychological evaluation of the Claimant. Dr. Neville noted that the Claimant was not taking any psychiatric medicines. According to Dr. Neville's evaluation, the Claimant occasionally relived the incident in which she stabbed her husband; she indicated hearing voices before having flashbacks of her husband. (R. 286). Dr. Neville noted that the Claimant was aggressive and quick to anger. He diagnosed the Claimant with "Rule Out Posttraumatic Stress Disorder, Antisocial Personality Disorder," and "Borderline Intellectual Functioning (Provisional)." He recommended psychiatric treatment and psychotherapy to improve her ability to manage her anger and aggressive behavior. Dr. Neville concluded that the Claimant's history suggested that she is not consistently able to respond appropriately to coworkers, unlikely to cope adequately with ordinary work pressures, and expected to resist or defy supervisors at times. (R. 288). Following Dr. Lisiak and Dr. Neville's evaluations, the Social Security Administration informed the Claimant that her period of disability had ceased on August 1, 2004. (R. 34).

In 2005, Claimant received mental health treatment from Patrice Harris, LPC, a therapist, for five months at Gateway in Birmingham. Claimant's chief complaints were blackouts and stress because of her husband's death and a childhood trauma. (R. 336). The Claimant's Discharge Summary indicated that she had five individual therapy sessions for childhood trauma

and PTSD. After achieving some improvement, the Claimant chose not to return for therapy. (R. 323). Although the Claimant's Global Assessment of Functioning score fluctuated during her treatment, she had a reported GAF of 66 upon both admission and discharge. (R. 324). A GAF score between 61 and 70 indicates that the Claimant "generally function[ed] pretty well." (R. 24).

The SSA received the Claimant's request for a hearing before an ALJ on June 2, 2005. (R. 38). On June 11, 2007, over two years later, the SSA informed the Claimant that a hearing had been scheduled for September 7, 2007. (R. 39). The hearing was later rescheduled for December 10, 2007. On April 3, 2007, Dr. Thomas J. Boll, Ph.D., performed a comprehensive psychological evaluation of the Claimant at the request of the Disability Determination Service (DDS). The Claimant told Dr. Boll that she awoke everyday around 5:00 or 6:00 A.M. to help her great-grandmother, a stroke victim. The Claimant did all of the housework, laundry, cooking, and shopping. (R. 318). Dr. Boll noted that the Claimant was not taking any psychiatric medication. He observed that the Claimant's enrollment in cosmetology school indicated that she was able to function in an academic environment and, very probably, an occupational environment. Dr. Boll also noted that while the Claimant could manage the cognitive requirements of an occupation, she appeared to have difficulty getting along with supervisors, a symptom consistent with a personality disorder. (R. 316). Dr. Boll diagnosed the Claimant with Oppositional Defiant Disorder (Axis II) and Diabetes (Axis III). (R. 318).

The following day, April 4, 2007, Dr. Boll completed a Medical Source Opinion Form. In that opinion, Dr. Boll indicated that in terms of a regular work setting (eight hours a day or a similar work schedule), the Claimant would have mild limitations in her ability to maintain social functioning and respond appropriately to supervisors, coworkers, and customers or members of

the general public. However, he also indicated that the Claimant had no limitations in her ability to use judgment in simple or complex work-related decisions; deal with changes in a routine work setting; carry out simple or complex instructions; maintain attention, concentration, or pace for at least two hours; or maintain daily living activities. (R. 319-320).

*The ALJ's Hearing*

The ALJ held two hearings in this case. The ALJ held the first hearing on December 10, 2007. He held the second hearing on May 6, 2008 after he received the Claimant's mental health records from Gateway. The Claimant did not have an attorney present at either hearing (R. 373, 402). The ALJ advised the Claimant of her right to representation; however, the Claimant chose to appear and testify alone at both hearings.

During the first hearing, the Claimant told the ALJ that her most significant physical medical problems involved her only kidney. According to the Claimant, she "spilled more protein than usual" while she was pregnant with her daughter, rendering her unable to sit for a full hour because of back pain. (R. 384-385). The Claimant also said that her back hurt after standing for less than an hour. (R. 386-387). As a result, she spent the "majority of [her] time" watching television in bed with her daughter. (R. 386). The Claimant took Ibuprofen and Motrin to help her kidney pain, but the medicines provided little relief. (R. 387). The Claimant said that she took Ambien, a prescription sleep aid, prior to becoming pregnant. (R. 388). The Claimant also testified that she took medication for hypertension and high blood pressure, conditions that caused the Claimant to see "little spots" and have headaches. The Claimant was unsure of her blood pressure reading. When asked about her blood pressure reading, she said she thought it was "150-something over 10-whatever, 100, 101, somewhere along in there." The Claimant testified

that the spots in her eyes and headaches were her only symptoms associated with high blood pressure. (R. 390).

The Claimant testified that she was taking Xanax to treat post-partum depression and had taken Adderrall in the past to "calm [her] down." The Claimant said that her depression caused her to get frustrated, which interfered with her ability to work. (R. 390-391). She indicated that she had problems interacting with her supervisors at Burger King and Pizza Hut, as well as her cosmetology teachers. (R. 393, 396). She also said that she had problems getting along with her mother because her mother "talks to [sic] much." (R. 398).  The Claimant reported blacking out on occasion when she became upset, but did not know why and had not seen a doctor about it. (R. 398). Additionally, the Claimant said that she used to take "water pills" because her legs had extra fluid in them. (R. 400).

After receiving the Claimant's mental health records from Patrice Harris at Gateway, the ALJ held a second hearing on May 6, 2008.  The ALJ first asked why the Claimant stopped receiving treatment from Gateway after her husband's death. The Claimant responded that she did not return to Gateway because her medication, the name of which she was unable to recall, had "calmed [her] down." The Claimant indicated she no longer took that particular medication. The Claimant said that her current medications included insulin, blood pressure medicine, an asthma inhaler, Albuterol, and an eczema cream. (R. 411-413).

The Claimant told the ALJ that hypertension hindered her ability to work more than any of her other conditions. The Claimant also said that she still had anger management problems and had difficulty getting along with her mother and neighbors. When asked what she had been doing since the first hearing, the Claimant said that she had been taking care of her daughter and

9

sometimes cleaned her mother's house. (R. 414-415). She said that she had not experienced a blackout recently. The Claimant said that she continued to suffer headaches because of high blood pressure but did not take any kind of pain medicine to relieve the headaches. (R. 415-417).

Following the Claimant's testimony, the ALJ questioned Claude Peacock, a vocational expert (VE). The VE indicated that the Claimant had no past relevant work. He concluded that a person sharing the Claimant's limitations could perform work as an electronics or plastics packer, assembler, collator, or parts sorter. (R. 419).The VE indicated that a significant number of jobs of these types existed in north central Alabama.  The VE also concluded that such a person would, however, be precluded from holding those jobs if she had moderately severe problems getting along with her coworkers or supervisors, or if her mental and physical problems caused her to miss work more than twice a month, or rendered her unable to maintain persistence and pace consistently for two hours at a time. (R. 420).

*The ALJ's Decision*

On August 19, 2008, the ALJ issued a decision finding that the Claimant had not been disabled since August 1, 2004. (R. 21). The ALJ determined that the Claimant had the following severe impairments: insulin dependent diabetes mellitus, "mild intermittent" asthma, occasional elevated blood pressure "without diagnosis of hypertension," major depressive disorder, post-traumatic stress disorder, and oppositional defiant disorder. (R. 23).  However, none of the Claimant's impairments, either singly or in combination, met the criteria of any of the listed impairments in 20 C.F.R. pt. 404, Subpart P, Appendix. 1. (R. 27).

The ALJ found that the Claimant had the RFC to perform medium work as defined in 20 C.F.R. 416.967(c) with the following abilities, limitations, and restrictions: "can do simple but

not complex tasks; can maintain attention and concentration for 2 hours at a time provided all customary breaks are given; contact with the general public, supervisors, and co-workers should be casual; supervision should be non-confrontational; changes in the work setting should be gradual and well-explained; occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand and walk approximately 6 hours in an 8 hour day; sit approximately 6 hours in an 8 hour day; would do best in an environment that is free of dusts, fumes, and gases and is temperature and humidity controlled; and unable to work around unprotected heights or dangerous or moving equipment and no ladders, ropes, or scaffolds." (R. 27-28).

The ALJ found that, since August 1, 2004, the Claimant's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms; however, the Claimant's statements "concerning the intensity, persistence, and limiting effects of [her alleged] symptoms [were] not entirely credible" because they were inconsistent with the objective evidence, including Dr. Lisiak and Dr. Boll's reports. (R. 28).

In his opinion, the ALJ quoted extensively from Dr. Boll's April 3, 2007 consultative physical exam of the Claimant, in which Dr. Boll concluded that the Claimant could function in an age-appropriate manner and could manage the cognitive requirements of an occupation. The ALJ noted that Dr. Boll concluded in his Medical Source Opinion form that the Claimant experienced no more than mild mental problems. The ALJ also noted that Dr. Lisiak reported no disabling problems and concluded that the Claimant could perform sedentary through medium work activity. The ALJ observed that the Claimant's records from Gateway showed that her mental health problems were only mild. (R. 28). This medical evidence, combined with the VE's testimony, led the ALJ to conclude that the Claimant "was capable of making a successful

adjustment to other work that exists in significant numbers in the national economy." (R. 30). Thus, the ALJ found that the Claimant was not disabled within the meaning of the Social Security Act.

## V.  DISCUSSION

The Claimant alleges that the Commissioner based her RFC on "selective and non-contemporaneous evidence" because the ALJ did not specifically evaluate Dr. Neville's July 2004 consultative mental exam. (Pl. Br. 6). "[T]here is no rigid requirement that

the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [the Claimant's] medical condition as a whole.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). Thus, while the ALJ's reference to Dr. Neville's evaluation may not be as thorough as the Claimant would like, he did not commit reversible error.

The Claimant argues that the ALJ failed to explain how the limitations identified by Dr. Neville could be accommodated in the jobs the ALJ found she had the RFC to perform. Although the ALJ did not directly address Dr. Neville's opinion, the ALJ considered Dr. Neville's exam as part of the evidence of record. In his opinion, the ALJ included a thorough review of Dr. Boll's consultative psychological evaluation, which encompassed a review of all the evidence of record and specifically noted Dr. Neville's diagnoses and observations.

The ALJ devoted much of his opinion to Dr. Boll's April 2007 consultative psychological exam. The ALJ quoted the portion of Dr. Boll's report that referred to Dr. Neville's findings. In the quoted portion, Dr. Boll reviewed the Claimant's mental health history, noting that Dr. Neville had previously performed a thorough evaluation on the Claimant. Dr. Boll noted that Dr.

Neville had diagnosed the Claimant with Anti-Social Personality Disorder, as well as a provisional diagnosis of Borderline Intellectual Functioning and a "rule out" diagnosis of Post Traumatic Stress Disorder, neither of which had ever been confirmed.

Claimant does not explain how the ALJ's RFC assessment fails to account for the limitations identified by Dr. Neville. Dr. Neville observed that the Claimant "is not consistently able to respond appropriately to coworkers," "not likely to cope adequate[ly] with ordinary work pressures," and "expected to resist or defy supervisors at times." Taking these limitations into consideration, the ALJ concluded that the Claimant's contact with the general public, supervisors, and coworkers should be casual; that any supervision should be non-confrontational; and that changes in the work setting should be gradual and well-explained. Moreover, the ALJ accounted for Dr. Neville's finding that the Claimant's "ability to carry out instructions is . . . moderately impaired" by concluding that Claimant can perform "simple but not complex tasks" and recommending that "changes in the work setting . . . be gradual and well explained." (R. 288; 28). Thus, the ALJ's opinion shows that he considered all the limitations reflected in Dr. Neville's findings when he determined the Claimant's RFC.

The ALJ did not specify the weight he gave to Dr. Neville's opinion. However, his failure to do so is harmless because he accepted the limitations reflected in that opinion. The ALJ's opinion indicates that he did indeed accept those limitations, but concluded that the Claimant nevertheless had the RFC to perform work that exists in significant numbers both in north central Alabama and the national economy. The record confirms that the ALJ properly determined the Claimant's RFC. He considered both favorable and unfavorable evidence, and his final determination included restrictions based on his review of the evidence.

## VI.  CONCLUSION

For the above reasons, the court concludes that the Commissioner's decision is supported by substantial evidence and is therefore AFFIRMED. The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 1st day of November 2010.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE